Thank you, Judge. My name is Gary Laughlin. I'm here on behalf of Mr. Braunstein and counsel. We believe the decision of the Court below is an error. Review is, of course, de novo, and there are some issues on sanctions, which Mr. Braunstein So he'll address the sanctions and you'll address the merits? Yes, sir. I'd like to approach this by Could you help me on the merits? And having the injunctive and declaratory relief were mooted out by the change in the program. Is that right? No, I don't believe so. Oh, I thought that was conceded. No. The program changed, but the need for injunctive relief in this particular case arises from this contract, which is not involving State funds. It is a local contract that is funded by a half-cent-a-gallon gas tax. So what injunction is sought now? It can't be an injunction to change the program. To change this contract, because this contract was let for one year with a discriminatory bias. So you want an injunction to re-award the contract? Yes, sir. Okay. Now I understand. Yes. Now, the claims other than that, to change the program or to declare the program unlawful, those are moved, right? The only Do you still seek a declaratory judgment that the program was unlawful? The program that was implemented as to this contract, we are not challenging the overall contract, the overall DBE program under the Federal Act. Now, on this contract, Brownstein didn't bid on it, right? He could not bid on it because he wasn't large enough. He sought work as a subcontractor under the contract. And he didn't bid on that either, did he? He sought work, yes. What do you mean sought work? Did he bid? No, you don't bid on subcontracting work. You provide a quote and the subcontractor decides who they're going to use based on On my locality, that's called a bid. Did he provide a quote? Yes. I believe that. I don't know that he provided one. He sought work from those who were the general contractors. Wait. You just said something that's really important to me anyway. Did he give them a quote or not? I don't think there's evidence in the record that he gave them a quote. He sought the work. He contacted them about work, but they were not interested in using it. So there's no evidence he gave them a quote, but there is evidence he called them and asked if he might get a piece of the contract or subcontract, and they said no. Yes, that's correct. Now, as I recall the record, well, let's see. I guess since he didn't make a quote, he can't claim to have been low bidder or to have offered a lower quote than they got from somebody else. Is that right? I think the only context in which we talk about low bidders is for the general contractor in this particular case. These are local usages. We call it a bid. In my locality, if you offer to do something for $10,000 and somebody else offers to do it for $15,000, you're the low bidder whether you call it a quote or a bid. All right. But as I understand it, the awarding of the contract is done to the prime contractor, and the prime contractor would be submitting a bid to Arizona DOT, and what he wanted was he wanted to be part of the bid submitted by the prime because he wanted to be the sub. So he went to the subs who were going to be or he went to the primes who were going to submit bids saying, well, you put me in as a sub with respect to what I want to do, and he's unsuccessful. That's correct. So nobody puts him in as a component of their bid. That's correct. Am I recalling correctly that the record shows that the prime had used him before and been unsatisfied with his work? Yes. So what evidence is there that his problem getting the work was the minority preference rather than their dissatisfaction with his work? The State of Arizona created preferences for minorities and females. Well, I understand the program, and you probably read in the course of your preparation a case I wrote called Monterey Mechanical about a somewhat similar program. I did. I don't have trouble with your argument about the program. My interest, though, is what interest does he have? The interest he has is that our courts, the Ninth Circuit and the United States Supreme Court in Adirondack v. Pena. I know about that, but much as I did not like the program in Monterey Mechanical, I could not have been a plaintiff in that case. None of the work was going to go to me no matter what. The constitutional injury is the inability to compete on an equal basis. And the courts have said in the Ninth Circuit case of Boya and in Monterey Mechanical is the injury would have occurred whether or not the plaintiff ultimately lost the contract. The injury is not the loss. Excuse me. I'm sorry. The injury is not the loss of the bid. Sure. The injury is the inability. You're entitled to be able to compete on an equal basis, but only if you're one of those competing. But he was competing. He was trying to get the work. And these contractors were awarded extra points in this multibillion-dollar 20-year contract. Or rather, they would have been awarded extra points. But Aztec is not a minority contractor. All contractors, every contractor who bid, met the DBE requirements. Every single one of them bid. You couldn't afford not to. That's the economic reality. If you're looking at a multibillion-dollar contract. I understand that part. But the work that he wanted to do as a sub, the winning bidder had somebody else do it as a sub, and that was Aztec. Is that correct? Correct. And Aztec is not a minority business, correct? Correct. It was, but it is not now. And was it at the time of the bid? No.  The problem with that, and I understand your argument, but if you're. . . The problem that I have with it is his entire company could have been owned, operated, and every employee could have been in one of these favored groups, and he still would not have gotten a job because the general didn't like him on account of previous unsatisfactory work. And what's more, he never offered a quote. That's the problem I'm having with the case, and need explained away. But you don't know who would have ultimately been awarded the general contractor without the preferences, because all of them felt they had to, and they did award work to DBEs. And you don't know how the dominoes would have fallen and who would have gotten the ultimate contract had they not had the preferences. Oh, you're saying maybe a different prime would have gotten it. Yes, sir. A prime that didn't have something against Brownstein. Yes, sir. And we don't know with Aztec. . . And did any prime have him included in their bid? No. No. But we don't know. But we don't know. . . Did he make a quote to any other prime? He sought work from other primes, yes. He sought work. He said, I'd like to do the work. I gather what you mean is he did not offer them a quote. He just. . . Correct. . . . talked to them about his general interest in doing work if they got the deal. Correct. But none of the. . . No, no, no. I'm sorry. Excuse me. What happens is they have to configure the work prior to submitting the bid. The way. . . When I used to do a little bit of construction litigation, the way it would work is in preparing the bid, the general would cost out what each sub was likely to cost the general, add those up, add up what other work there was, add up materials, put on 25 percent for profit and overhead, and that was the bid. So if there were no numbers, they really couldn't get started. Well, I think what you're missing is that in this statement of qualifications and ultimately the contract, they had to list the DBE contractors they were going to use. They had to identify them. And then they had to make the commitment to use them throughout the term of the contract, and that's monitored by ADOT during the 20 years. You can't tell what would have happened had that DBE requirement not been there. I'm just using it very simply. Well, I think we kind of can tell because he's asking these various would-be primes, will you have me be the participant to do this work? None of them say yes. Correct? Correct. Is this in the record as to all of the bids that were submitted for this particular contract? Who were the prime — who were the subs or would have been the subs doing the work that he wanted to do? Were any of them DBEs? I can't answer that. I believe it's in the record of the bids who was — who were DBEs. I know Aztec was the sub for about three of them. I'm sorry. I can't remember that. Let me give you a hypothetical case. Yes, sir. It's been bothering me here. It's totally hypothetical. It's made up. It's not real. Let's imagine a black female who seeks jobs with a number of employees or a number of employers such as cashier. She's able to prove for every one of the employers that there's some reason to believe that they discriminate by race and sex. She's able to come up with evidence of remarks that are negative about race and sex for every one of them. Every one of them that she feels out says, we're not interested in you, we're not going to be interested in you, we're not ever going to be interested in you as an employee. And the reason turns out to be, when they're deposed, that she had just gotten out of prison after doing six years for embezzlement. Does she have a case that can get past summary judgment for a Title VII violation? A great lawyerly-like answer may be depending upon other facts that may exist. If they had other cashiers who they had hired with a criminal record, that may well be evidence of discrimination if they were of a different sex and a different gender. If they, yes, if they had hired some white males who had done time for embezzlement. Yes. Yes, it could have. Okay. But in this case. But that's not in the hypo. Is that in this case, hiring? No. Is that the case? No. No. Okay. But, again, I think that you can't tell what would have happened if you had the even playing field and you didn't have the preference. I think we got your point. You've been interesting for 11 minutes and 30 seconds, so let's hear from your co-counsel. Thank you. Got the hook. Yeah, you just did. Thank you. Or is that a kind way of saying you cease to be interesting? It's a kind way of saying you were supposed to get five when we gave you 11 and a half. Your Honor, may it please the Court, Paul Gerding. If you'd put it at five. Paul Gerding on behalf of Mr. Braunstein. I was going to address the sanction issues. And, Your Honors, I think the previous discussion probably illuminated the primary difficulty that we're having in this case. There is a misapprehension or at least confusion with regards to how the law should have been applied to the facts of this case. The plaintiff and their counsel wholeheartedly believed and believe to this date that the injury, in fact, was the discrimination and that we did not have to prevail up front for standing on whether or not they ultimately would have been awarded the contract. That was part of the reason why fees were shifted to the plaintiff and counsel as, in part, the other issue was the immunity issues, which relates to the 11th Amendment. Those were squarely addressed in the briefing. And, again, we believe that the Court and, respectfully, our counsel. I think your problem on the 11th Amendment was you can't get damages from a State government. You can get an injunction against a State official. And it looked as though you weren't pleading the case in such a way that you could get by the 11th Amendment. I believe that the issue with the 11th Amendment, and, Mr. Laughlin, is far better at this than I am. But as I understand it, in studying for the sanctions issues, it is a qualified immunity under the 11th Amendment. Wrong. Well, the Court – I'm sorry. It's not like a policeman's qualified immunity. It's a different body of law. They made the immunity as the State when they accepted the Federal funds. And the Court landed – But not under 1983. They didn't. They did that under the Highway Act, not for 1983. Under Section 1883, the issue that the Court raised, which was also raised in the Western States case, was that there's no standing with regards to going after an official in their official capacity. But in this case, we went after the individuals in their individual capacity. Well, let me go after this part. You sought damages from the State, and you sought damages from the individuals in their official capacity. You also sought remedies against the individuals in their individual capacity. Correct. But I'm focused for the moment on the 11th Amendment defense mounted by the State and mounted by the officers sued in their official capacities. When the suit is brought – when the claim is brought under 1983, there's a case squarely against you, Kern v. Jordan, no doubt about that case. Did you know about that case? With regards to the individual capacity? No, I – would you please listen to the question? Thank you. I said individuals sued in their official capacity, and the State sued, qua State. Kern v. Jordan is squarely against you. Did you know about that case? At that time, when it was first filed, I was not aware of it. It's a Supreme Court case right there and staring you in the face. At what time do you – when do you become aware of that case? I became aware of it when we got into the Western States' arguments on the 11th Amendment with Mr. Laughlin in discussing whether or not we had appropriate claims under 11th Amendment. It didn't even occur to you that you might have had an 11th Amendment issue when you were suing the State for damages? It absolutely occurred to us, and we discussed the – And so you didn't do any research, and you didn't discover Kern v. Jordan? We did do research, but – And you didn't discover the Supreme Court case that squarely says, unambiguously, the question is whether 1983 abrogates the protection of the State, and the answer is no. And the answer has always been no. With regards to the individual capacity, that's where my focus was, not on the official capacity for the individuals. With regards to the State, as I understood it, we were saying the immunity was waived, waived by the acceptance of the federal funds for the program. But that's not – but you're bringing a 1983 suit for discrimination. That's a separate claim. I understand. Okay. Got it. I will defer to Mr. Laughlin and save time for rebuttal. Are there any further questions? No, thank you. Response? Thank you, Your Honor. May it please the Court. Kelly Schwab on behalf of all of the appellees except Victor Mendez. Your Honor – Are you splitting the argument? We are. I will take 7 minutes and posing – or Mr. O'Malley will take 3. Okay. Thank you, Your Honor. You've summarized the problems in this case very succinctly. Counsel, help me a little bit with distinguishing this from Monterey Mechanical. Your Honor – Say – just formulate in summary form. If you were writing a disposition, your paragraph – just read me your imagined paragraph if you could write the disposition that says why Monterey Mechanical does not apply to this case. Your Honor, in this case, appellant had 3 years to establish a record of why there was a barrier. Wait. Now you're just giving me meaningless rhetoric. I'm not – I'm not – I've never seen a disposition where we say appellant had 3 years to establish a record and we have to say this case differs from Monterey Mechanical in that. Da-da-da-da-da. Give me the da-da-da-da-da. Thank you, Your Honor. Your Honor, this case does differ from Monterey Mechanical in that plaintiff had no standing to even challenge this case. Okay. Why not? He had no standing because he did not present anything on the record that showed the DBE was a barrier to him competing on an equal basis. Your Honor, he did not bid. He did not provide quotes. Well, he's a white male contractor instead of a female or minority contractor. Correct, Your Honor. And he was given 3 years. So in Monterey Mechanical, we said such a contractor does in fact have a barrier against him because he can't help the prime satisfy its – its aspirational need to employ females and minorities. But in this case, Your Honor, the record shows that the reason, the barrier, was his own actions. It wasn't based on the DBE program. And he could have submitted a quote. There's simply no record that he did. There's no evidence that he could have – that he was not able to compete on an equal basis. Incidentally, tell me a little bit about the way the contracting is done. I'm used to subs making a bid on the subcontract. You're building a building, and you want to find an electrical sub, and the sub makes a bid for how much they'll charge to do the work if the prime or the general gets – we call them generals – gets the contract. I gather that's not the procedure in this locale, that the procedure is just talk, no bid, until after the prime gets the contract? That is not the procedure, Your Honor. In this case, this was a statement of qualifications for a design contract. And subs submitted quotes. They submitted their qualifications to the primes, who then had the option of picking which – You can't submit a quote, submit their qualifications. Qualifications is my wife owns the business, not me, and she's president. I'm just the guy that does the dirt work or whatever. That's the qualifications. The quote is, we will do the work for $180,000. Correct. We are qualified to do the work, we do this work, and we will do it for $100 per utility location, something to that effect. That's what the State Department of Transportation is used to seeing. That was not on the record in this case. Apparently, calls were made. Again, we have no evidence. There were no depositions. There were no interrogatories that established that on the record. The record is completely void of any – There was evidence, as I recall, in the record that this prime wouldn't have hired him no matter what. It was a prior bad experience, right? Yes, Your Honor. That was admitted. I think it sounds like what we can infer is that the general or the prime, and this would be ordinary practice, might invite various subs for particular pieces of the contract, invite them to submit a bid. But they're not going to invite everybody to submit a bid or to submit a quote. It sounds like they didn't want to ask this guy to submit a quote. Correct. And they already had a – Is that the practice there? I mean, I've seen some deals where the general just makes it public and anyone can submit a bid. That is the practice, usually on construction-type bids. This was a design-related bid. So it was more of an engineer. So they do invite. They do. And, in fact, there were five – there were six contractors who bid on this and each had different practices on how they invited their subs. But, again, the record is devoid of any evidence that appellant was invited or tried to be invited, other than a phone call maybe that he made. And that is the problem. That goes to the standing issue in this case. There is no standing on appellant to even challenge this. And the mood arguments are absolutely correct. They brought in a 1983 and a 1981 claim against the State, the Department, and the individuals in their official and personal capacity. And despite requests that they be dismissed, because the Eleventh Amendment precluded  Let's hypothesize for the moment. Obviously, we're not going to make a determination particularly on something that's moot. Let's hypothesize that the program was an unlawful and unconstitutional program because of the race and sex discrimination against whites and males. Let's just hypothesize that. Yes, sir. Would Brownstein have a cognizable claim? No, Your Honor. Another contractor may be able to show they had a cognizable claim. Brownstein has failed to make that even minimal standing showing. And exactly why? What would be the reasons? Because he has shown, number one, he did not bid. He wasn't even there at the plate. There's no evidence in the record. There's nothing on the record that shows he tried to get this job and there was a barrier because of the DBE requirements. The only thing on the record. So this is kind of like a California 17,200 claim. Something bad is being done and I don't like it, so I'm suing? That's what it is. He has said the DBE program was there. It's unconstitutional. Now you shift the burden state. You guys prove why it is constitutional. He has that burden to show that he has standing to even come forward and challenge it, and he has failed to meet that burden. There may be, there could have been a contractor out there that could have made that burden, made that challenge. This is not the case before you today, and that is the problem. And that's why. Let me ask you now about the sanctions, or is that your colleagues? We're both prepared to address that, sir. Okay. On the sanctions, I've never seen 1927 sanctions used for anything but a case where a litigant unreasonably multiplied proceedings, and it's always been grossly, extremely unreasonably multiplied proceedings, like where you get two file folders of stuff, and you don't even know what's in there, two file shelves, drawers full of stuff about a simple case, and you don't even know why they're there, and the defendant is getting bombarded and running up hundreds of thousands or millions of dollars in lawyer's fees on a small claim of little merit. As far as I can tell, this case, there's no extraordinary volume of paper that was generated, is there, for this sort of case? That's a fair statement, Your Honor. There is not an extraordinary volume of paperwork. However, I think that's the case. Not repetitive motions after things had already been disposed of? There – what happened in this case is motions had to be filed to dismiss claims that should never have been brought. And – Well, now, on that, that's a different thing from the 1927.  Correct. Let me stick with 1927 a minute. If somebody loses and he just keeps filing the same motion over and over again, that's a 1927 situation. Did that happen? Other than this case was tried through the State court and then filed again in district court with different legal theories, but it was basically the same case. And Judge Sedgwick at the trial court was very aware of that. And furthermore, appellate – You're allowed to file similar things in Federal court because the rules may be a little different. Correct. You may get a different outcome on the same argument. But appellant's counsel was the one that was – the counsel in the Western Paving case that was decided shortly before this action was filed in district court. And that court, when it went back to the trial court, clearly said the Eleventh Amendment precluded this. Let me ask you something about that, because that's the second time you've shaded toward it and it is relevant and significant. It seems pretty plain that plaintiffs had some trouble grasping the Eleventh Amendment issues. What I could not help thinking of as I thought through that was a Ninth Circuit decision called Blatchford, as I recall. I think it was Blatchford, where the Ninth Circuit just got it absolutely flat, simply and plainly wrong. And the Supreme Court quickly said so, 9-0. Just missed the Eleventh Amendment. It was the Eleventh Amendment, even though it was argued. Blatchford was a no-attack village. Oh, you remember, too. I was really happy about that, because I was the district judge. I got it right. The Ninth Circuit got it flat wrong unanimously. And then the Supreme Court got it right unanimously, 9-0. It was great. Anyway, they have to be smarter than us or else they get sanctioned with tens of thousands of dollars? I think had, in this case, had appellant not just come off the Western paving decision, just been made, those same arguments had been made and been rejected soundly by the Court, and he turned around in pursuit. The Eleventh Amendment arguments were rejected soundly by the Ninth Circuit in Blatchford. I mean, that the arguments were wrong. In fact, they turned out to be right. Well, Your Honor, I think that's where Judge Sedgwick had. You're not allowed to take another shot, you're saying, in another case. Yes. Well, no. I'm saying that he continued to pursue actions that he knew. I mean, a district court decision, a district court decision is not precedent for another district court. You lose in front of one district judge. You can certainly take another shot in front of another or even in front of the same one in another case. But the law is clear on the Eleventh Amendment as to 1983 and 1981 cases, as to the State and the official cases. It's clear to me now. I didn't actually know much about it until I was a district judge. But it was clear when this action was filed in 2007, especially in light of this Court's ruling and the district court ruling in the Western paving case. And it was clear with this appellant, Your Honor. And I think that Judge Sedgwick, in his order, he laid out why he felt sanctions were appropriate. And we'd ask you to uphold that. It was sound reasoning. It was not an abuse of discretion. Let me ask you this. It occurred to me, I mean, we've got two State court actions and then we've got a Federal court action. Did you ever argue a race judicata when you came into Federal court? Yes, Your Honor, we did. And you lost because? Trying to remember. Actually, we argued that the appellant had waived their claims under a settlement agreement. And the Court rejected that argument. No, you didn't argue. I don't know what the Arizona rule is going to be. But it would be Second Restatement Section 24, the user to lose it. That is to say, the claim could have been brought in the earlier litigation, was not brought in, and is therefore gone. You didn't make that argument? They made Federal claims under the Federal court that wouldn't have been brought under the State court, and we did not make that argument. And the State court was jurisdictionally incompetent to hear the Federal claims? Okay. Well, this is water under the bridge. I'm not prepared to answer. Yeah, okay. On Eleventh Amendment errors, one thing that typically happens is a plaintiff, not familiar with the nonintuitive aspects of Eleventh Amendment jurisprudence, sues some State official in his official capacity for an injunction in damages. There is a motion to dismiss the lawsuit because of the Eleventh Amendment. The plaintiff's lawyer discovers he's not going to be able to get damages against the State government, and he discovers that he better change his complaint. So what he does is he sues for an injunction against the individual and argues that the individual should be treated under ex parte young as acting ultra virus. And then he's home free, no more dismissal. Why couldn't that be? Could that have been done here? Possibly, but Appellant did not do that. So he could have saved himself his Eleventh Amendment sanction just by amending the complaint in that respect? Potentially, but also the very persons he was complaining about actions had left the Department by that time. They had gone on to other jobs. So he would have had to just substitute the name of a new official, like our cases that are against Gonzales and New Casey and Holder, just because different AGs come in and out. But they didn't. Appellant continued to try and get damages. That's what the big focus of the case was, but did not establish any record, did not file amended pleadings after motions to dismiss were granted. And it took us four times arguing motions or bringing forth motions, three times bringing forth motions to dismiss and summary judgment to get this case dismissed. In the meantime, asking Appellant to limit his claims appropriate with the law, which he simply refused to do. And that is clear on the record and presented to this Court under the supplemental record. Okay. Thank you. Thank you, Your Honor. Your co-counsel did not save three minutes for you. However, why don't we reset the clock to three minutes. Thank you very much, Your Honor. Kevin O'Malley, on behalf of former Director Mendez. Why sanctions? Because in the Western Savings case that came down, implementing this Court's ruling, the district court in Washington said, one, injunctive relief for the district court decision, right? District court decision. But let's just add up the points here. Number one, injunctive relief is moved, declaratory relief is moved. I don't see why anyone would be subject to sanctions. Pardon me? I don't see why anyone would be subject to sanctions because they did not take their law from a district court decision. It's not binding precedent. It's not binding precedent, Your Honor, but if you think about it, what is the purpose of bringing an injunctive relief claim when the program has been terminated? The Washington case gave them a template for the analysis. It was exact – Arizona did exactly what Washington did. It terminated the program in response to your decision and went out and did a disparity study. And it has never put the program back in place. So forget whether it's a district court decision. Well, that's not because of Western Savings, then. That's because why bring a claim that a program ought to be terminated when it already has been? And all I'm saying is judges many times want to know that lawyers have been given a little bit of a warning, a little bit of a heads-up. If you go down this path, you're running into trouble. And Western Paving gave them that heads-up. Same thing with the 1981-83 claims. The district court told them what the Eleventh Amendment law was and dismissed that. Undeterred, they go down to Arizona, filed the same claim. But you keep talking about Western Paving as opposed to trying to enjoin a program that's already disappeared. And it's two different things. And when you talk about Western Paving, I'm thinking every lawyer has practiced in front of a superior court judge or a federal district judge who made what the lawyer thinks is a mistake. And maybe the lawyer is right that it is a mistake. If the lawyers weren't sometimes right about that, there would be no reversals coming from the Ninth Circuit. And so the lawyer takes a shot at it again in his next case, either in front of the same judge or a different one. And there's nothing wrong with that. Well, the problem – I understand that, Your Honor. But the problem here is you're asking for injunctive or declaratory relief on a program that's not in place. Yeah. Well, here's my problem. And I've not decided quite how I'm going to come down on it, frankly. And I may differentiate among various causes of action and so on. I mean, but attorneys' fees under 1988, of course, as you know, are asymmetrical. A prevailing plaintiff gets attorneys' fees simply for prevailing. Correct. And the defendant, prevailing defendant, is to say you, on a 1983 claim, gets fees only if the complaint was frivolous. Higher burden, no doubt. And losing, of course, doesn't mean frivolous. Correct. Absolutely, Your Honor. But look at the claims. When had you heard of the case of Kern v. Jordan? I don't remember, Your Honor. You still haven't heard of it. It's not in your brief. Well, I can tell you this, Your Honor. If you look at each and every, you want to go down each and every claim, I think that is appropriate. But think about it this way. The injunctive relief was moot. The 1981-83 claims were barred by the Eleventh Amendment. The 2000D claim, that only survived in Western Paving because there was Federal funds involved. Early on in this case, Laughlin was told in an extensive letter that's in the record, there are no Federal funds involved. You know what? He didn't need to be told that because he made the argument in the State court action that preceded it, and it's in the appellate opinion that's in the record, that these were all State funds. So absent Federal funds, he had no 2000D claim either. So he had no claims under any of the theories he had previously advanced. None. So what does he do? So it's my client in his personal capacity. Well, what do you need to show in personal capacity? Again, Western Paving identified what you need to do, what this Court knows you need to do. You need to marshal evidence, evidence of discriminatory intent, evidence that my client substantially participated in the discriminatory conduct. Look, this is so complicated. This is so complicated. I sort of don't see how you can be frivolous. It reminds me a little of that, oh, the famous Lucas v. Ham decision that no one understands the rule against perpetuity, so it can't be malpracticed to mess it up. I think that was what Lucas v. Ham. I only understood it, Judge, from watching that movie. Was it body heat or whatever? It's funny. It's really funny. Western States Paving, a 20-head note case with a dissent, resolving conflicts among circuits and deciding which way the Ninth Circuit is going to go. And, boy, to say that your complaint is frivolous when you take a position that is that difficult anyway, I don't know. Well, Your Honor, looking at my client's perspective, knowing that you have to marshal evidence, like letter law, you have to marshal evidence to sue the individual to get over the qualified immunity to establish discriminatory intent. What was done in this record? I think that's why you won. What was done in this record? Nothing. Look, you obviously won the case because it was plain to everybody that Brownstein didn't get the work because he had not rendered satisfactory performance with the crime sometime before. So that's it. And he was told that, Your Honor, in the 2008 Court of Appeals opinion. But the standing doctrine on these set-aside programs is incredibly complex and nonintuitive. Well, I thought your opinion was very well done. I tried my best. I thought it was very clear. You know, I still haven't understood any of his opinions. I'm glad somebody liked it. Okay. I think we got the point. Would you like two minutes? I'll let them go over. And it better be interesting. I'll do my best. If I can't get interesting, I'll do some magic tricks and tell a couple jokes. Briefly, the issue of the State court proceedings was raised and the judge below dealt with that in his first decision. He said that it was not precluded by the State court action. It wasn't even brought before the State court, and they would hear it. If you read his first decision, that was taken care of. Secondly, on the issue of standing, if you read the U.S. Supreme Court in Northeastern Florida contractor's case and a decision of this court in AGC of California, which if I remember correctly came out of San Francisco, it dealt a little bit differently with organizational standing. But one of the elements of organizational standing was raised in both of those cases that none of the members of AGC had bid on the contract or would but was likely to get it. And the Supreme Court said it didn't matter. It's the inability to compete, not that they actually competed, but the inability to compete on an equal basis is the constitutional injury. And they've also said if you — it doesn't matter that you don't get it. It doesn't matter that you would never get it. It's the inability. That's the injury. Roberts. We've read the cases. Okay. But I'm just — I'm trying to do it. The Eleventh Amendment, I think, is important to look at what the judge did. The judge said that the defendants convincingly demonstrated Bronson's lawyer that no Federal funds were associated with the contract and there was no basis for a claim under Title VI. And the claim was frivolous from the sponsor. He was dead wrong. He was dead wrong. His analysis followed the Grove City decision without mentioning it, that you had to have Federal funds in a particular program. The United States Congress in 1997 amended the Civil Rights Act, the Civil Rights Restoration Act, that added that if the State Department receives any funds, then Title VI applies to all funds. You've made that point in your brief, I think. I did. But, I mean, it's — they don't seem to understand that. We might. I would hope so. I hope I'm being interesting enough to get you to understand. You are plenty interesting, but your two minutes are up. Okay. Thank you. Thank you for your time. Thank both sides. Case of Brownstein v. Arizona Department of Transportation now submitted for decision.
judges: Hug, Kleinfeld, Fletcher